ALLIANZ INSURANCE COMPANY, Plaintiff-Appellee, v. GUIDANT CORPORATION, Defendant-Appellant (Zurich Specialties London, Ltd., *et al.*, Intervenors and Third-Party Plaintiffs-Appellees; American International Specialty Lines Insurance Company *et al.*, Third-Party Defendants-Appellees).

Second District    No. 2—04—1038

Opinion filed January 28, 2005.—Rehearing denied March 18, 2005.

Mary Rose Alexander, Maaike S. Hudson, and Paige S. Ormond, all of Latham & Watkins, L.L.P., of Chicago, G. Andrew Lundberg, of Latham & Watkins, L.L.P., of Los Angeles, California, and Terry A. Ekl and Vincent C. Mancini, both of Connolly, Ekl & Williams, P.C., of Clarendon Hills, for appellant.

Lazar P. Raynal and Geoffrey A. Vance, both of McDermott, Will & Emery, of Chicago, and Margaret H. Warner and Gregory A. Krauss, both of McDermott, Will & Emery, of Washington, D.C., for appellee Allianz Insurance Company.

Josh M. Kantrow, of Cozen O'Connor, of Chicago, and J.C. Ditzler and Jodi McDougall, both of Cozen O'Connor, of Seattle, Washington, for appellees Gerling Konzern Allgemeine Versicherungs-AG, Liberty International Insurance Company, and Zurich Specialties London Ltd.

Joseph A. Hinkhouse, Richard McDermott, and Sarah H. Dearing, all of Lord, Bissell & Brook, L.L.P., of Chicago, for appellee American International Specialty Lines Insurance Company.

Lori E. Iwan, James K. Horstman, and Douglas M. DeWitt, all of Iwan, Cray, Huber, Horstman & VanAusdal, L.L.C., of Chicago, for appellee Westchester Fire Insurance Company.

Michael W. Morrison, of Tressler, Soderstrom, Maloney & Priess, of Chicago, for appellee Lumbermens Mutual Casualty Company.

JUSTICE GROMETER delivered the opinion of the court:

Defendant, Guidant Corporation (Guidant), appeals an order of

the circuit court of Du Page County denying its request for a partial stay of this insurance coverage lawsuit. We affirm.

## I. BACKGROUND

### A. The Ancure Device and the Underlying Claims

Guidant, through its wholly owned subsidiary, Endovascular Technologies, Inc. (EVT), developed and manufactured a medical device known as the Ancure Endograft System (Ancure Device). In September 1999, the Food and Drug Administration (FDA) approved the Ancure Device for commercial sale. The Ancure Device was sold and distributed by Guidant Sales Corporation (GSC), another wholly owned subsidiary of Guidant. The Ancure Device was used to treat abdominal aortic aneurysms, a potentially life-threatening condition arising from the development of a weak area in the wall of the aorta. The Ancure Device, which is inserted through an incision in the patient's leg, uses a delivery system to place a woven fabric graft into the aorta to prevent rupture. Prior to the introduction of the Ancure Device, treating an abdominal aortic aneurysm required traditional surgery in which the patient's abdomen had to be cut open to allow the surgeon to reach the aorta.

After sales of the Ancure Device commenced, EVT became aware of various malfunctions associated with the delivery system used to place the graft. Some of these malfunctions resulted in the delivery system becoming improperly lodged in a patient's body, often requiring the removal of the delivery system by traditional open surgical repair. As a result, some EVT sales representatives informed doctors about a procedure involving breaking or cutting the handle of the Ancure Device's delivery system when the delivery system became lodged and could not be removed without resorting to traditional open surgical repair. This procedure, which became known as the "Handle-Breaking Technique," was not presented to the FDA for approval.

Under federal law, a company is required to file a medical device report (MDR) with the FDA when it appears that a device has malfunctioned in such a way that it may have caused or contributed to a death or serious injury, or has malfunctioned and would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. 21 U.S.C. § 360i(a)(1) (2000). When placement of the Ancure Device required additional surgical procedures, an MDR was required to be filed with the FDA. On March 16, 2001, EVT suspended commercial sales of the Ancure Device and recalled those devices remaining in circulation "after discovering a number of regulatory deficiencies relating to the Ancure System." By that time, more than 7,600 Ancure Devices had been sold. On June 12, 2003, EVT pleaded

guilty to 10 felonies relating to the Ancure Device, including misbranding and making false statements to government regulators. See http://www.usdoj.gov/usao/can/press/html/2003_06_12_endovascular.html. In connection with the plea agreement, EVT agreed that it "knowingly and intentionally misled [the] FDA about the frequency with which the delivery system of the Ancure Device malfunctioned." EVT also acknowledged:

> "Between September 30, 1999 and March 16, 2001, defendant filed 172 MDRs for the delivery system of the Ancure Device.
>
> On or about March 23, 2001, defendant disclosed to [the] FDA the existence of approximately 2,628 additional MDRs concerning the delivery system of the Ancure Device that had not been previously reported to FDA as required by law. Among these 2,628 MDRs that had not been timely filed were 12 deaths and 57 conversions to traditional open surgical repair."

As a result of the plea agreement, EVT agreed to pay the federal government $92.4 million, which included a forfeiture of $10.9 million, a criminal fine of $32.5 million, and a civil settlement of $49 million. Although the Ancure Device was returned to the market following further FDA review, Guidant and some of its subsidiaries, including EVT and GSC, faced numerous lawsuits for injuries allegedly suffered by individuals as a result of the implantation or attempted implantation of the Ancure Device (the underlying claims).

### B. The Insurers and the Coverage Litigation

According to plaintiff Allianz Insurance Company's complaint, it began issuing insurance coverage to Guidant in 1997. Relevant here, Allianz, Guidant's first-layer carrier, issued to Guidant policy number ULA 4100422 for the period September 1, 2000, through September 1, 2001, and the period September 1, 2001, through September 1, 2002. EVT and GSC were named insureds under the Allianz policy. In addition, six additional insurers, Zurich Specialties London Limited (Zurich), Gerling Konzern Allgemeine Versicherungs-AG (Gerling), Liberty Mutual Insurance Company (Liberty), American International Specialty Lines Insurance Company (AISLIC), Westchester Fire Insurance Company (Westchester), and Lumbermens Mutual Casualty Company (Lumbermens) provided Guidant with excess product liability coverage during the same time periods.

In or about July 2000, in conjunction with the policy renewal commencing September 1, 2000, Guidant provided Allianz with information regarding the nature of its business and the nature and extent of any losses it faces, to allow Allianz to underwrite the risk. At the same time, Guidant completed an application for insurance coverage containing questions regarding underwriting the risk. In or about

June 2001, Guidant provided Allianz with additional information in conjunction with the policy renewal beginning September 1, 2001. For instance, Guidant was posed the following questions and gave the following answers on its 2000 and 2001 applications:

"21. Are there any integrated or batch occurrences or claims, whether or not reported to an insurance carrier as an integrated or batch occurrence, during the past 10 years or since the inception of the Applicants' first Bermuda market excess liability policy (which ever is longer) which have cost or are reasonably expected to cost more than $2 million U.S. (or equivalent)?
YES ( ) NO ( X )

\* \* \*

22. Are the Applicants aware of any actual, alleged or suspected cause, event or condition associated with on-going completed, divested and/or discontinued operations/entities that might reasonably be expected to give rise to a liability loss or damages including indemnity and expense in excess of U.S. $2 million (or equivalent), aggregating as one loss all liability losses attributable directly or indirectly to the same actual, alleged or suspected cause, event or condition.
YES ( ) NO ( X )
**To the best of our knowledge**
If YES, please describe fully,
23. Are the Applicants aware of any actual, alleged or suspected defect, hazard or failure to warn or such, associated with present, invested and/or discontinued goods or products manufactured, sold, tested, handled or distributed by the Applicants, or similar products, which might reasonably be expected to give rise to a liability loss or damages including indemnity and expense in excess of U.S. $2 million (or actual, alleged or suspected defect, hazard or failure to warm [sic]?
YES ( ) NO ( X )
**To the best of our knowledge**" (Emphases in original.)

At various times between August 2001 and September 2003, Guidant advised Allianz of the underlying claims arising out of the Ancure Device. By a letter dated October 20, 2003, Allianz disclaimed liability for these claims. On November 6, 2003, Allianz filed a four-count complaint against Guidant. Relevant here, count I of Allianz's complaint alleged common-law fraud on the basis that Guidant made "false representations and concealed and failed to disclose the status of the Ancure product defects and claims arising therefrom in the course of Guidant's application for the 2000 issuance of Allianz Policy Number ULA 4100422, and also in the course of its application for the 2001 renewal of Allianz Policy Number ULA 4100422," knowing that such representations were false, in order to secure insurance from Allianz.

In addition, count IV of Allianz's complaint sought a declaration that the policies issued to Guidant do not provide coverage for claims, losses, or liabilities related to the Ancure Device. Count IV was divided into two parts. Part one sought a declaration that there is "No Coverage for the 'Civil Settlement' that Arises from a Criminal Plea." In this regard, Allianz argued that, for various reasons its policies did not provide coverage for the $49 million EVT agreed to pay the federal government in June 2003. Among these reasons were that the settlement: (1) fell outside the policy period of Allianz's coverage; (2) constituted a voluntary settlement made without prior approval in violation of the policies; (3) arose from Guidant's "willful, intentional or deliberate acts in the reporting or failure to report to the FDA as required by federal law"; (4) did not constitute an occurrence under the policies; and (5) constituted an uninsurable "known loss." Part two, captioned "Other Issues Related to Civil Settlement and/or Individual Bodily Injury Claims," sought a declaration that the Allianz policies do not provide coverage because, among other things: (1) many of the underlying claims occurred after the expiration of the policies; (2) the underlying claims resulted from "willful, intentional or deliberate acts in the reporting or failing to report to the FDA as required by federal law and/or continuing to distribute the Ancure Device despite knowledge that implant of the Ancure Device was substantially certain to result in failure rates well beyond those disclosed to patients(s) [sic] and physicians"; and (3) the underlying claims were "known losses."

Shortly after Allianz sued Guidant in Illinois, Guidant and some of its subsidiaries filed suit in Marion County, Indiana, against Allianz and each of the six excess insurers, seeking a declaration that Allianz must defend the underlying claims and that each of the insurers must indemnify Guidant for such claims. On May 25, 2004, the Indiana court entered an order staying the Indiana action pending resolution of Allianz's fraud claim against Guidant in Illinois

On June 18, 2004, Zurich, Gerling, and Liberty were granted leave to intervene in the Illinois insurance coverage litigation. The intervenors then filed their own complaint against Guidant, naming AISLIC, Westchester, and Lumbermens as third-party defendants. The third-party defendants filed cross-claims against Guidant, claiming that they are entitled to a declaration that their polices do not provide coverage for the underlying claims. Hereinafter, we refer collectively to Allianz, the intervenors, and the third-party defendants as the "Insurers" and to the Insurers' lawsuits against Guidant in Illinois related to the insurance coverage as the "coverage litigation."

## C. Motion for Partial Stay

Meanwhile, on March 17, 2004, Guidant filed a motion for a partial stay of the coverage litigation pending resolution of the underlying claims. Notably, Guidant requested the court to stay "all aspects of this case other than questions regarding Allianz['s] *** duty to defend Guidant from the underlying claims." Guidant asserted that "there is a significant overlap between the Underlying *** Claims and this coverage action as to factual and legal issue—such that discovery into, or the determination of, these issues in the coverage case could" prejudice Guidant in the underlying claims. On September 16, 2004, the trial court denied Guidant's motion for a partial stay. In so holding, the trial court stated:

"[T]he issues [raised in the underlying claims and the coverage litigation] are severable. I don't believe that the issue in th[e coverage] case is whether this device was *** allegedly bad stuff.

I think the issue is, what was known at the time the applications were made, and whether there was, indeed, an awareness of potential liability or potential exposure or expense? I think that that's a completely separate issue from whether there was negligence, whether this device was poorly made, or any other allegation that might exist in any of those [underlying claims].

The issue is awareness, and if that awareness existed, whether it was communicated or whether it should have been communicated in a reasonable relationship between an insured and a potential insurer."

On October 15, 2004, Guidant filed a notice of interlocutory appeal.

## II. ANALYSIS

### A. Jurisdiction

Our first task is to determine whether we have jurisdiction to consider this appeal. In its brief, Guidant premises jurisdiction on Supreme Court Rule 307(a)(1) (210 Ill. 2d R. 307(a)(1)). Rule 307(a)(1) allows an interlocutory appeal from orders "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." The Insurers question our jurisdiction, contending that the trial court's order is "more akin to a discovery ruling or a ministerial or administrative order" because Guidant limited its request for a stay to only a portion of the litigation, *i.e.*, the portion not relating to the duty to defend.

■ Whether an order is appealable as an injunction under Rule 307(a)(1) depends on the substance of the action, not the form of the order. *Chicago City Bank & Trust Co. v. Drake International, Inc.*, 211

Ill. App. 3d 850, 854 (1991). Nevertheless, we note that Illinois courts have broadly construed the meaning of "injunction" for purposes of Rule 307(a)(1). *In re A Minor*, 127 Ill. 2d 247, 260-61 (1989). Indeed, this court has expressly held that a "stay order" is synonymous with an injunction. *Medline Industries, Inc. v. Pascal*, 23 Ill. App. 3d 346, 348 (1974); see also *Lundy v. Farmers Group, Inc.*, 322 Ill. App. 3d 214, 216 (2001) (noting that courts have treated the denial of a motion to stay as a denial of a request for a preliminary injunction); *Disciplined Investment Advisors, Inc. v. Schweihs*, 272 Ill. App. 3d 681, 691 (1995) (noting that a motion requesting a court to stay its own proceeding pending resolution of a related case is in effect a request for an injunction and is appealable pursuant to Rule 307(a)(1)); *Zurich Insurance Co. v. Raymark Industries, Inc.*, 213 Ill. App. 3d 591, 594 (1991) ("[t]he case law in Illinois clearly establishes that a denial of a motion to stay is appealable as of right under Supreme Court Rule 307(a)(1) [citation]"); *Beard v. Mount Carroll Mutual Fire Insurance Co.*, 203 Ill. App. 3d 724, 727 (1990) (holding that the denial of a stay by a trial court is treated as a denial of a request for a preliminary injunction). At the same time, we recognize that Illinois courts have rejected the notion that matters involving purely discovery matters are appealable under Rule 307(a)(1). *Lewis v. Family Planning Management, Inc.*, 306 Ill. App. 3d 918, 921 (1999); *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 231 Ill. App. 3d 619, 624 (1992); *In re Marriage of Blitstein*, 212 Ill. App. 3d 124, 130 (1991). These so-called "ministerial" or "administrative" orders do not fall within the realm of injunctive relief and cannot be the subject of an interlocutory appeal because they regulate only the procedural details of the litigation before the court. *In re A Minor*, 127 Ill. 2d at 262.

█ In this case, we conclude that the trial court's order denying Guidant's motion for a partial stay is properly appealable under Rule 307(a)(1). In its motion for a partial stay, Guidant requested an order "staying all aspects of this case other than questions regarding Allianz['s] *** duty to defend Guidant from underlying product liability claims." Guidant asserted that, while it would not be prejudiced if the duty-to-defend portion of the case proceeds, "[a]s to all other aspects of this case *** there is a significant overlap between the Underlying Products Claims and this coverage action as to factual and legal issues—such discovery into, *or the determination of*, these issues in this coverage case could legally and practically operate to Guidant's prejudice in the Underlying Products Claims." (Emphasis added.) Moreover, in the memorandum supporting its motion, Guidant asked the court to stay "all discovery *and adjudication* of factual and legal

issues which impact upon the underlying products claims." (Emphasis added.) Thus, while the stay affected discovery matters, it also impacted the adjudication of the underlying factual and legal issues. In other words, the trial court's order regulated more than just the procedural details of the litigation before the court. Although we acknowledge that the trial court's order involves only a partial stay of the litigation, the Insurers do not cite any authority that would divest this court of jurisdiction on this basis. We point out that, typically, a request for injunctive relief encompasses only a portion of the litigation, yet such orders are expressly appealable under Rule 307(a)(1). See, *e.g.*, *In re A Minor*, 127 Ill. 2d at 263 (involving order restraining party from disseminating certain information); *Cummings v. Beaton & Associates, Inc.*, 192 Ill. App. 3d 792, 796 (1989) (same). Having concluded that we have jurisdiction to consider the matters raised in Guidant's interlocutory appeal, we proceed to address its merits.

## B. Merits

Guidant argues that, in denying its motion for a partial stay, the trial court ignored well-settled principles of law requiring it to enjoin those aspects of this litigation that relate to or overlap with the underlying claims. According to Guidant, the Insurers will suffer no prejudice if a stay is imposed. In contrast, Guidant asserts that the trial court's decision will substantially prejudice it by requiring it to "fight a two-front war—one against its adversaries in the Underlying Lawsuits, and the other againsts [*sic*] its own Insurers—and who could be subject to collateral estoppel in those [underlying] Lawsuits from factual or legal findings in the [coverage litigation]." The Insurers deny that the coverage litigation and the underlying claims involve overlapping issues. According to the Insurers, the trial court's decision was properly based on its factual determination that the underlying claims involved issues separable from the coverage litigation.

■ A trial court's decision to grant or deny a motion to stay will not be overturned on appeal absent an abuse of discretion. *May v. SmithKline Beecham Clinical Laboratories, Inc.*, 304 Ill. App. 3d 242, 246 (1999). Under this standard, we do not reverse the trial court simply because we may disagree with its decision. *May*, 304 Ill. App. 3d at 246. Rather, we assess whether the trial court acted arbitrarily without the employment of conscientious judgment or, in light of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted. *May*, 304 Ill. App. 3d at 246. Employing the relevant standard of review, we cannot say that the trial court abused its discretion in denying Guidant's motion for a partial stay.

■ It is well established that when an insurer is uncertain of its obligations and rights as to its insured, it can file a declaratory judgment action. *United States Fidelity & Guaranty Co. v. Jiffy Cab Co.*, 265 Ill. App. 3d 533, 536 (1994). However, as a general matter, a declaratory judgment action to determine an insurer's duty to indemnify its insured should not be decided prior to the adjudication of the underlying action where the issues to be decided in both actions are substantially similar. *Murphy v. Urso*, 88 Ill. 2d 444, 455 (1981); *Burnett v. Safeco Insurance Co. of Illinois*, 227 Ill. App. 3d 167, 174 (1992) (noting that "a declaratory judgment action brought prior to a determination of the insured's liability is premature since the question to be determined is not then ripe for adjudication"). The rationale for this rule is " 'that an untimely determination in the declaratory judgment action could subsequently prejudice a party in the underlying action through application of collateral estoppel.' " *Brotherhood Mutual Insurance Co. v. Roseth*, 177 Ill. App. 3d 443, 451 (1988), quoting *Maryland Casualty Co. v. Chicago & North Western Transportation Co.*, 126 Ill. App. 3d 150, 157 (1984). Nevertheless, in *Murphy*, 88 Ill. 2d at 455-57, our supreme court carved out an exception for declaratory judgment actions brought to determine insurance coverage where the issues are separable from those in the underlying action. See *Bonnie Owen Realty, Inc. v. Cincinnati Insurance Co.*, 283 Ill. App. 3d 812, 818-19 (1996); *Illinois State Medical Insurance Services, Inc. v. Cichon*, 258 Ill. App. 3d 803, 807 (1994); *Bituminous Casualty Corp. v. Fulkerson*, 212 Ill. App. 3d 556, 561 (1991).

The parties here do not seriously dispute the law applicable to this case. Instead, they differ regarding the application of the law to the facts before us. In support of its position that the legal and factual issues in both the underlying claims and in the coverage litigation are not separable, Guidant first asks us to examine the fraud claims. Guidant insists that where insurance coverage litigation and the claims underlying such litigation involve exactly the same legal cause of action, such lawsuits necessarily overlap. According to Guidant, such is the case here, where the Insurers and the plaintiffs in the underlying claims are alleging exactly the same causes of action (fraud and misrepresentation) and relying on exactly the same facts (the recall, plea agreement, civil settlement, and related events) in an attempt to prove that Guidant knew about the alleged defects with the Ancure Device either prior to the use of the system (plaintiffs in the underlying claims) or to the selling of the policies (Insurers). The Insurers counter that the fraud claims in the coverage litigation and the fraud claims made by the plaintiffs in the underlying claims are based on different alleged actions by Guidant.

■ We find that although the fraud allegations in the Insurers' complaints and those in the underlying claims share a common title, *i.e.*, fraud, there is no overlap of ultimate facts. See *Continental Casualty Co. v. Coastal Savings Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (holding that district court could decide declaratory judgment action involving insurance coverage even though underlying litigation and declaratory judgment action arose from the same fact pattern where the legal and factual issues in the two cases were different). Allianz's common-law fraud claim alleges that Guidant made "false representations and concealed and failed to disclose the status of the Ancure product defects and claims arising therefrom in the course of Guidant's application for the 2000 issuance of Allianz Policy Number ULA 4100422, and also in the course of its application for the 2001 renewal of Allianz Policy Number ULA 4100422," knowing that such representations were false, in order to procure insurance from Allianz. The remaining Insurers make similar claims. In other words, the Insurers' fraud claims allege fraud perpetuated by Guidant on the Insurers in applying for coverage. That is, the Insurers seek to find out whether Guidant knew of any claims arising from the Ancure Device at the time that it applied for insurance but failed to relate this knowledge to the Insurers. Contrary to Guidant's argument, the issue the Insurers raise with regard to fraud is not whether Guidant and its subsidiaries knew about the *alleged defects* with the Ancure Device before the insurance policies were sold. Rather, the determinative issue as it relates to the Insurers' fraud claims is whether Guidant and its subsidiaries knew about *potential claims* arising from the use of the Ancure Device before the insurance policies were sold.

In contrast, the plaintiffs in the underlying claims make various claims of fraud and fraudulent concealment, focusing not on what Guidant told the Insurers about potential adverse claims against it, but rather alleging that Guidant and its subsidiaries misled the plaintiffs, the FDA, the medical community, and the public at large by intentionally concealing reports of injury and death related to the Ancure Device. Thus, the underlying claims involve allegations of fraud perpetuated by Guidant regarding the safety and risks of the Ancure Device. A finding as to whether Guidant committed fraud during the insurance application process does not overlap with the issue of whether Guidant misrepresented the health risks of the Ancure Device to patients or the FDA. Accordingly, we find the fraud claims in the coverage litigation separable from the fraud allegations in the underlying claims, and we reject Guidant's request to reverse the trial court's decision on this basis.

■ Guidant also challenges the Insurers' assertion that there is no

coverage for the underlying claims because there was "no occurrence" under the policies. The basis for this assertion by the Insurers is that the conduct leading to the underlying claims was "willful," "deliberate," or "intentional." Specifically, the portion of the request for declaratory relief that Guidant cites from Allianz's complaint alleges:

"90. The underlying claims arise from Guidant's willful, intentional or deliberate acts in the reporting or failure to report to the FDA as required by federal law and/or continuing to distribute the Ancure Device despite knowledge that implant of the Ancure Device was substantially certain to result in failure rates well beyond those disclosed to patients(s) [sic] and physicians."

Guidant contends that these allegations, which concern intentional wrongdoing on the part of the insured, present the "classic situation in which the declaratory judgment action should be stayed."

The problem with Guidant's position is that EVT, Guidant's wholly owned subsidiary and a named insured under the Allianz policies, acknowledged in the plea agreement it entered with the federal government in June 2003 that it: (1) "knowingly and intentionally misled [the] FDA about the frequency with which the delivery system of the Ancure Device malfunctioned" and (2) failed to disclose "the existence of approximately 2,628 additional MDRs concerning the delivery system of the Ancure Device that had not been previously reported to FDA as required by law." Given that Guidant, through its subsidiary EVT, admitted in the plea agreement to the intentional conduct alleged in Allianz's complaint, no questions of fact remain regarding the alleged behavior. *Illinois State Medical Insurance Services, Inc.*, 258 Ill. App. 3d at 809 (holding that insured's guilty plea eliminated question of fact regarding insured's conduct); see also *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378, 384-86 (2000) (in the context of a criminal conviction following trial). As a result, we fail to see how Guidant would be prejudiced by the trial court proceeding with the Insurers' declaratory judgment actions. However, we leave it to the trial court to determine whether this admission constitutes an "occurrence" under the policies and whether a duty to indemnify exists.

▪ In a related argument, Guidant relies on the policies' definition of the term "occurrence" in support of its argument urging us to reverse the trial court's decision denying Guidant's motion for a partial stay. In support of this argument, Guidant cites to paragraph 90 of Allianz's complaint, which is reproduced above. Allianz's policy defines "occurrence" as "an event, including continuous or repeated exposures to conditions, which result in Personal Injury and Property Damage neither expected nor intended from the standpoint of the Insured."

According to Guidant, because the plaintiffs in the underlying claims seek to prove that they have been "personally injured" by the Ancure Device, requiring Guidant to address whether there is an "occurrence" would force it to demonstrate in the coverage litigation that the plaintiffs in the underlying claims were in fact injured by Guidant's conduct. However, Guidant's focus on the personal injury aspect of the definition of "occurrence" ignores the true nature of this allegation of Allianz's complaint. The focus of this claim is not whether there was personal injury, but whether the insured's conduct was intentional, and, as we found above, Guidant admitted in the plea agreement that the conduct was intentional.

Guidant also notes that the Insurers allege that there is no coverage for the underlying claims because Guidant knew of such claims, *i.e.*, there is a "known loss." Guidant claims that to prove a "known loss" as a bar to coverage, the Insurers must show that when Guidant purchased the insurance policies, it knew of the alleged problems with the Ancure Device, that the underlying claims would be filed, and that liability was likely to result. Thus, according to Guidant, to prevail on this theory, the Insurers will have to show "who at Guidant knew what, and when." This, Guidant claims, overlaps with the underlying claims. We disagree.

Insurance is based on contingent risks. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 103 (1992). When the insured knows or has reason to know when it purchases a policy of insurance that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes an uninsurable "known loss." *Outboard Marine Corp.*, 154 Ill. 2d at 103. Our supreme court has stated that the known loss doctrine may be invoked if the insured "knew or had reason to know *** that there was a substantial probability that loss or liability would ensue due to the [conduct] for which it is seeking coverage." *Outboard Marine Corp.*, 154 Ill. 2d at 107; see also *Missouri Pacific R.R. Co. v. American Home Assurance Co.*, 286 Ill. App. 3d 305, 309 (1997). Thus, in order to prevail on their known loss theory, the Insurers need demonstrate to the trial court only that Guidant knew or had reason to know that claims related to the Ancure Device had been made or would be made and the likely extent of that exposure. In contrast, aside from the separable fraud claims discussed above, the plaintiffs in the underlying claims allege various theories of recovery including strict product liability, negligence, breach of warranty, and wrongful death. In other words, the issues in the underlying claims concern whether Guidant is legally responsible for the injuries allegedly suffered by the plaintiffs as a result of the implantation or attempted

implantation of the Ancure Device. To prevail on their known loss claims, the Insurers need not demonstrate whether the Ancure Device was unsafe or even whether Guidant knew whether the Ancure Device was unsafe. Instead, the Insurers need show only that there was some exposure as a result of the Ancure Device.

Guidant claims that it will suffer substantial prejudice if the trial court's ruling is allowed to stand. For instance, relying on *Old Republic Insurance Co. v. Chuhak & Tecson, P.C.*, 84 F.3d 998 (7th Cir. 1996), Guidant asserts that, when *overlapping factual issues* exist, discovery in the coverage litigation could undermine the insured's defenses in the underlying claims. This could be a concern if there were, in fact, overlapping factual issues. However, for the reasons discussed above, the issues in the coverage litigation and the issues in the underlying claims are separable. Therefore, we fail to see the import of this claim of prejudice. Moreover, to the extent that the discovery sought in this case overlaps with the discovery sought by the plaintiffs in the underlying claims, we believe that a carefully crafted protective order will serve the parties' interests. We note that the parties have been working toward such a goal and that it appears that, on October 14, 2004, the trial court ordered the parties to "prepare the Protective Order consistent with the Court's rulings following arguments on Guidant's Motion for Protective Order."

Guidant also claims prejudice in the form of collateral estoppel. However, we agree with the Insurers that Guidant cannot be collaterally estopped by any of the trial court's findings with respect to the issues here, because they are either separate and distinct from the issues raised by the plaintiffs in the underlying claims or they relate to intentional conduct already admitted to by Guidant or its subsidiaries. See *United States Fidelity & Guaranty Co.*, 265 Ill. App. 3d at 537 (noting that collateral estoppel does not apply where issue to be resolved in coverage litigation is wholly separable from any of the issues raised by the plaintiff in the underlying claim); *Illinois State Medical Insurance Services, Inc.*, 258 Ill. App. 3d at 809.

## III. CONCLUSION

For the foregoing reasons, we conclude that the trial court did not abuse its discretion in denying Guidant's motion for a partial stay. Accordingly, we affirm the order of the circuit court of Du Page County.

Affirmed.

HUTCHINSON and KAPALA, JJ., concur.